**UNITED STATES of America, Plaintiff,**

v.

**IVACO, INC., Canron, Inc., and Jackson Jordan, Inc., Defendants.**

**No. G89–40032 CA.**

United States District Court, W.D. Michigan, S.D.

Feb. 8, 1989.

U.S. Dept. of Justice, Antitrust Div. by Willie L. Hudgins, Jr., John Docherty, Robin Millen and John F. Greaney, Washington, D.C., for plaintiff.

Winston & Strawn by Edward L. Foote, John W. Stack, R. Mark McCareins, Chicago, Ill., Fried, Frank, Harris, Shriver & Jacobson by Eric H. Queen, New York City, for defendants.

## OPINION

ENSLEN, District Judge.

In this action under Section 7 of the Clayton Act, 15 U.S.C. § 18, the United States seeks to enjoin a proposed joint venture between Jackson Jordan, Inc. and Ivaco, Inc., through its subsidiary Canron Industries, two manufacturers of automatic tampers. The government filed its verified complaint, seeking a temporary restraining order and preliminary injunction, on January 12, 1989. The Court entered a temporary restraining order on January 13, 1989. Hearings on the government's motion for a preliminary injunction began on January 17, 1989 and continued until January 24, 1989. The parties submitted post-hearing briefs on January 30, 1989 and February 3, 1989. The following constitutes the Court's findings of fact and conclusions of law on the government's motion, pursuant to Federal Rule of Civil Procedure 52(a). For the reasons stated below, I find that the government has established a substantial likelihood of success on the merits of its Section 7 claim and that a preliminary injunction is necessary to protect the public interest. The government's motion is, therefore, granted.

### Background

Jackson Jordan, Inc. ("Jackson Jordan") is an Illinois corporation with its headquarters in Schaumburg, Illinois. Jackson Jordan produces an automatic tamper known as the 6700 at its plant in Ludington, Michigan. The 6700 is capable of tamping both switches and mainline track, and can tamp mainline track at a rate of 1,500 feet per hour. Plaintiff's Exhibit ("PX") 19; Transcript of Hearing on Motion for Preliminary Injunction ("Tr.") at 490.

Ivaco, Inc. is a Canadian corporation, headquartered in Montreal, Quebec, Canron, Inc. ("Canron") is a Canadian corporation headquartered in Toronto, Ontario. PX. 18. Ivaco owns 79 percent of Canron. Canron Industries is a wholly-owned United States subsidiary of Canron, Inc. Tr. at 348–49; 351. Tamper Corporation ("Tamper") is a wholly-owned subsidiary of Canron Industries. Tr. at 351. Tamper manufactures automatic tampers at its facility in Columbia, South Carolina. Its automatic tampers are known as the Mark III and C Series, and are capable of tamping mainline track at a rate of 1,500 feet per hour. PX 19; Tr. at 363.

On December 29, 1987, Jackson Jordan and Canron agreed to enter into a joint venture which would combine the automat-

ic tamper business of Jackson Jordan and Tamper, along with the firms' other railway maintenance of way businesses. The joint venture would be owned equally by Jackson Jordan and Canron. Jackson Jordan and Canron would agree not to compete with the joint venture in the maintenance of way industry. PX 19; Tr. at 392–94. An owners' committee, consisting of representatives from Jackson Jordan and Canron, would manage the joint venture. Tr. at 393. Mr. Donahue, the president of Jackson Jordan, would be the president of the joint venture. Tr. at 489.

A tamper is a machine designed to place ballast underneath a railroad track tie in order to level and shift the tie, correcting for deviations in the track caused by train travel. Tr. at 18–19; 175. Tampers may be either manual or automatic. Tr. at 26; 175. Manual tampers, as the name suggests, require an operator to stop and start the machine's function. Manual tampers are capable of tamping only about 200 to 600 feet of track per hour, are less expensive than automatic tampers, and are primarily used for yard tamping, tamping switches that have already been raised by hand, and spot tamping. Tr. at 26–37. Automatic tampers correct deviations in railroad track by lifting the track to a predetermined height, shifting it into the proper alignment and placing ballast underneath the tie to maintain the desired position. Tr. at 18–24; 364. Automatic tampers are used for tamping switches which have not previously been raised by hand, and for tamping long sections of mainline track. Tr. at 35–40. Most automatic tampers are capable of tamping approximately 1500 feet of track per hour, while others are capable of tamping between 2000 and 4000 feet per hour. Tr. at 35–40; 81.

Currently only three firms manufacture and market automatic tampers in the United States: Jackson Jordan, Tamper, and Plasser American. Tr. at 68–69; 453; 480; 490–93; 680. There are no imports of automatic tampers into the United States. Tr.

at 68; 241; 417; 506–07. Plasser American ("Plasser") is a division of Plasser & Theurer, an Austrian corporation. Tr. at 13. Plasser manufactures tampers at its plant in Chesapeake, Virginia. *Id.* Plasser offers a number of different automatic tampers, including the PUM and PSPT, products which are close substitutes for the 6700 and Mark III, and the continuous action tamper ("CAT"). PX 1, 2, 3; Tr. at 23. The PSPT is capable of tamping both switches and mainline track at speeds equivalent to those of the 6700 and Mark III. At present, the CAT is capable only of tamping mainline track. Tr. at 31. Plasser's 16–tool CAT is capable of tamping track at a rate of about 2,000 feet per hour, while its 32–tool CAT is capable of tamping track at a rate of about 4,000 feet per hour. Tr. at 29–30. Plasser also manufactures products known as dynamic stabilizers and ballast regulators, which operate to settle railroad track after it has been tamped, reducing or eliminating the need for so-called "slow orders." [1] Tr. at 440; 470–71. No other manufacturer in the United States offers a continuous action tamper, dynamic stabilizer or ballast regulator. Tr. at 441; 471.

Approximately 50 automatic tampers are sold each year in North America, generating sales revenues of between ten and eleven million dollars. Tr. at 497; 607–08. The major customers for automatic tampers are Class 1 railroads, transit systems and large industries. Tr. at 18; 176; 598. Sales of tampers are usually accomplished by bid solicitations from the customers to the various tamper manufacturers. These solicitations generally specify the type of tamper requested, and manufacturers answer by bidding products capable of meeting the customers' specifications. Most bids are sealed. Tr. at 34–37. Jackson Jordan, Tamper, and Plasser often bid their respective tampers in response to the same bid solicitations. PX 6; Tr. at 40–41; 48–49; 450; 524; 535–39. Customers general-

---

**1.** A "slow order" is a temporary speed restriction placed upon train travel by railroads. Slow orders are usually necessary for a period of time after a track is resurfaced, in order to

allow the track to settle into its new position. Railroad companies obviously wish to avoid slow orders, because these speed restrictions cause delays. Tr. at 439–440; 468.

ly do not disclose price information regarding competitors' products to other manufacturers. Tr. at 44.

The major customers are interested in buying technologically advanced maintenance equipment, because such equipment reduces the amount of time needed to maintain railroad track and increases the amount of time the track may be used for revenue generating purposes. Tr. at 437–39; 467–68. Plasser's CAT represents a technological innovation in the tamper industry because its continuous action features allow it to tamp mainline track more quickly than more conventional tampers. *Id.* Despite its technological advances, CAT sales declined from 10 or 11 machines in 1985 to 2 machines in 1988. Tr. at 60–64. Plasser estimates that it will sell only two units in 1989.[2] *Id.* Some major tamper customers have indicated that they will confine their future tamper purchases to the CAT. Tr. at 597–98. Other customers anticipate purchasing conventional tampers in addition to CATs over the next several years. Tr. at 455–56; 477–78. The market for automatic tampers, and for railway maintenance of way equipment in general, appears to be shrinking. Tr. at 475–76; 496–99; 637–39; 826–27.

The government's statistical evidence shows that in 1985, Tamper had a market share of 45.6% in the market for automatic tampers. Jackson Jordan's market share was 38.4% and Plasser's was 16% in the same year. In 1986, Tamper controlled 45.7% of the market, Jackson Jordan had a market share of 19.0% and Plasser had increased its market share to 35.3%. In 1987, Tamper again led the market with 45.0% of the sales, while Jackson Jordan increased its share to 25.1% and Plasser fell somewhat to 29.9% of the sales. PX 14. Assuming these figures accurately predict the defendant's future market shares, the joint venture would create a firm controlling 70% of the automatic tamper market. Two firms would control 100% of the market.

*Motion to Strike*

■ In their post-hearing brief, the defendants renew their motion to strike the testimony of plaintiff's expert economist, Dr. Russell Pittman, on the ground that his opinion about the economic effects of the proposed joint venture is without sufficient foundation. Specifically, the defendants argue that Dr. Pittman cannot form a reliable opinion on the relevant product market and probable price effects of the proposed transaction because he lacks sufficient information on the prices charged for the products at issue.

I denied that motion during the hearing, and I will deny it again now. Dr. Pittman testified that he based his opinion on documents submitted by the defendants to the Department of Justice and, to a lesser extent, upon information supplied by relevant consumers and a representative of Plasser, Ralph Miller. Tr. at 174–75. While Dr. Pittman testified that he lacked detailed information concerning the current prices of tampers in the American market, he also testified that it was possible to form an opinion regarding the competitive effects of a merger or joint venture without using detailed price information. Tr. at 333–34. *See also* Tr. at 667–69 (possible to define product market without detailed price information). I note further that defendants' economic expert relied on precisely the same sort of information in forming her opinion on the competitive effects of this joint venture, an opinion which I am sure the defendants would not wish to strike from the record. Tr. at 591; 594–95. While Ms. Guerin–Calvert may have acquired more detailed information on the prices of competing products, I further note that her estimates of the relevant prices did not vary considerably from those offered by Dr. Pittman. *Compare* Tr. at 228 *with* Tr. at 621–23. *See also* Tr. at 503–04 (estimating price of Jackson Jordan 6700 at about $200,000.00). Finally, the price estimates relied upon by Dr. Pittman approximate the actual selling prices for

2. A customer survey conducted by the defendants' expert witness indicated that Class 1 railroads would purchase between 9 and 21 CATs

each year over the next four years. Tr. at 607–08.

Jackson Jordan 6700s between 1983 and 1987. *See* Defendants' Exhibit ("DX") 7.

I conclude, therefore, that there is sufficient foundation in the record supporting the admissibility of Dr. Pittman's expert testimony. I am satisfied that he relied upon the sort of information generally relied upon by experts in this field when forming an opinion on the competitive effects of a proposed transaction. F.R.E. 702–703; *In re Japanese Electronic Products Litigation*, 723 F.2d 238, 277 (3d Cir. 1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *In re Agent Orange Product Liability Litigation*, 611 F.Supp. 1223, 1243–55 (E.D.N.Y.1985), *aff'd*, 818 F.2d 187 (2d Cir.1987); 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 703[03] (1988). The motion to strike is denied.

### Standard

The Court must consider four factors in determining whether to grant the government's motion for a preliminary injunction:

(1) the likelihood of success on the merits of the action;

(2) the irreparable harm that could result if the court did not issue the injunction;

(3) the impact on the public interest; and

(4) the possibility of substantial harm to others.

*Forry Inc. v. Neundorfer, Inc.*, 837 F.2d 259, 262 (6th Cir.1988); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985); *Martin–Marietta Corp. v. Bendix Corp.*, 690 F.2d 558 (6th Cir.1982); *Bolthouse v. Continental Wingate Co.*, 656 F.Supp. 620, 625 (W.D.Mich.1987).

### Likelihood of Success on the Merits

■ The government contends that the proposed joint venture would violation Section 7 of the Clayton Act, 15 U.S.C. § 18. This statute provides, in pertinent part:

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital ... [or] the whole or any part of the assets of another person ... where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

The statute is designed to protect the public from transactions designed to lessen competition, based upon the fundamental economic theory that "where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels." *FTC v. PPG Industries*, 798 F.2d 1500, 1503 (D.C.Cir.1986).

In order to prevail on its Section 7 claim, the government must establish a reasonable probability that the proposed joint venture may substantially lessen competition in the relevant product and geographic market. "Section 7 does not require proof that a merger ... has caused higher prices in the affected market. All that is necessary is that the merger create an appreciable danger of such consequences in the future. A predictive judgment, necessarily probabilistic and judgmental rather than demonstrable, is called for." *Hospital Corporation of America v. FTC*, 807 F.2d 1381, 1389 (7th Cir.1986). The transaction at issue here is a joint venture, rather than a merger. The defendants argue that joint ventures are subject to a "slightly different analysis" under Section 7 than are mergers. In *United States v. Penn–Olin Chemical Co.*, 378 U.S. 158, 170–77, 84 S.Ct. 1710, 1716–20, 12 L.Ed.2d 775 (1964), the Supreme Court considered the legality of a proposed joint venture, noting that such transactions should be analyzed on the basis of two criteria: (1) whether each of the two parents are potential competitors in the joint venture's market and, if so, (2) whether the joint venture is likely to injure competition. In this case, of course, both of the parent firms are actual competitors in the automatic tamper market, the same market in which the joint venture would operate. The analysis of whether the proposed transaction will injure competition does not differ materially when the transaction is characterized as a joint venture rather than as a merger. *See also*

*United States v. Philadelphia National Bank*, 374 U.S. 321, 362, 83 S.Ct. 1715, 1740, 10 L.Ed.2d 915 (1963).

1. *Product Market.* A merger or acquisition violates Section 7 only if its effect may be substantially to lessen competition "in any line of commerce ... in any section of the country." 15 U.S.C. § 18. The statutory phrase "in any line of commerce ... in any section of the country" refers to a relevant market which has both product and geographic boundaries. Thus, determination of the relevant product and geographic markets is a necessary predicate to finding a violation of Section 7. *United States v. Marine Bancorporation Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1964). The plaintiff bears the burden of establishing an economically significant product and geographic market. *United States v. Connecticut National Bank*, 418 U.S. 656, 669–70, 94 S.Ct. 2788, 2796–97, 41 L.Ed.2d 1016 (1974).

The court must consider a number of factors in defining the relevant product market for Section 7 purposes, including cross-elasticity of demand, *United States v. Continental Can Co.*, 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed.2d 953 (1964); cross-elasticity of supply, *Twin City Sport–Service, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1271 (9th Cir.1975); industry usage and recognition, *Reynolds Metals Co. v. FTC*, 309 F.2d 223, 226–29 (D.C.Cir.1962); complementarity of function and functional integration, *United States v. Hughes Tool Co.*, 415 F.Supp. 637, 640 (C.D.Cal.1976). In *Brown Shoe*, the Court noted that, "The outer boundaries of a product market are determined by the reasonable interchangeability of use or cross-elasticity of demand between the product itself and substitutes for it." 270 U.S. at 325, 82 S.Ct. at 1523. *See also United States v. E.I. DuPont deNemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956).

The court need not consider every conceivable, but economically unrealistic, substitute for a particular product, nor is it proper to require a complete competitive overlap, or total fungibility, between products before considering them to be part of a single product market. *United States v. Continental Can Co.*, 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed.2d 953 (1964). Thus, "[i]nterchangeability of use and cross-elasticity of demand are not to be used to obscure competition but to 'recognize competition where, in fact, competition exists.'" *Id.* at 453, 84 S.Ct. at 1745 (quoting *Brown Shoe*, 370 U.S. at 326, 82 S.Ct. at 1524). The fact that there may be discernable submarkets within a particular product market, or that products within a market do not compete against each other for every consumer end use, does not preclude a finding that the products form a single product market. *Id.* 378 U.S. at 453–54, 84 S.Ct. at 1745–46. Thus, where competition between non-identical products is "insistent, continuous, effective and quantity-wise very substantial," the products may be grouped in a single product market, even if they have different end uses. *Id.* at 453, 84 S.Ct. at 1745.

■ In this case, the government argues that the relevant product market is the market for automatic tampers. Tr. at 229–31. In forming his conclusion on this matter, the government's expert witness noted that Jackson Jordan, Tamper and Plasser customarily bid their respective automatic tampers against each other in response to bid inquiries by customers, even where the customers' specifications may have called for one particular machine to the exclusion of the others. PX 5, 6; Tr. at 229–30. Internal corporate documents disclosed substantial and continuous price competition between Jackson Jordan and Tamper, indicating that the firms' pricing policies were responsive to their competitors' behavior. PX 8, 9, 10, 11; Tr. at 254–61. Further, he noted that customers at present have no economic substitute for automatic tampers. Tr. at 232. All railroads must purchase tampers in order to maintain their tracks, and there is no other product which will perform the tamping

function. Further, manual tampers are simply too slow to meet the major customers' tamping needs. Tr. at 233–38. *See also* Tr. at 458–59; 680–82; 815–16. The government's expert also concluded that there was low cross-elasticity of supply because other firms, even those in related maintenance of way industries, could not easily enter the automatic tamper market. Tr. at 233, 236; 813–14. Because customers could not discipline a price increase in automatic tampers by substituting away to other products, and because other firms could not discipline a price increase by entering the market with a lower priced product, the government concludes that all automatic tampers fall within a single product market. Tr. at 233–34.

The defendants argue that three product markets exist: one for manual tampers, another comprised of "conventional" automatic tampers (the Jackson Jordan 6700, the Tamper Mark III, the Plasser PSPT and CAT–09, and used tampers) and a third comprised of the newer, "high technology" continuous action tamper manufactured only by Plasser (the CAT–09 or "CAT"). Tr. at 595–96. Although the CAT at times competes with conventional tampers for sales, the defendants' expert witness argues that the two must be placed in distinct product markets because certain customers intend to confine their future tamper purchases to CATs, and because the price of the CAT is unaffected by the price of conventional tampers. Tr. at 597–98. Alternatively, the defendants argue that the relevant product market could be defined as a cluster of maintenance of way products. They note that no maintenance of way firm manufactures every conceivable maintenance of way product and that all firms in the business must manufacture more than one product to survive. Tr. at 436; 467; 649–51. Further, railway companies must purchase a number of different products in order to maintain their track properly.

I find that the government has correctly defined the relevant product market as the market for automatic tampers. This product market includes the Jackson Jordan 6700, the Tamper Mark III and C Series, the Plasser PUM, PSPT and CAT. This product market definition is appropriate because there is low cross-elasticity of demand and low cross-elasticity of supply. Customers cannot substitute another product for tampers in the face of a significant, non-transitory price increase, because no other product is available to perform the tamping function. The various automatic tampers are close substitutes for each other because they all perform the tamping function, although some perform more efficiently than others. Thus, the various tampers are interchangeable as between themselves, but are not interchangeable with other maintenance of way products. The automatic tampers currently on the market compete with each other for sales. Similarly, the evidence establishes that entry into the automatic tamper market is costly and time-consuming. Firms in related industries could not quickly enter the automatic tamper market to discipline a significant price increase, because entry into the market would require an extensive investment in research and development as well as in production facilities. There are no imports into the United States market at present, and there was little evidence indicating that a foreign supplier could be expected to enter the market. For these reasons, I conclude that the relevant product market is the market for automatic tampers.

■ I am not persuaded by the defendants' argument that the relevant product market is the "cluster" of all maintenance of way equipment. First, although it is true that consumers purchase more than one type of maintenance of way equipment and that suppliers produce more than one type of that equipment, it is also true that the various pieces of equipment are not functional substitutes for one another and, more significantly, that producers of the equipment cannot easily switch from producing one type of machine to another. Each piece of maintenance of way equipment involves different technology and engineering. While it may be possible to produce various products in a single manufacturing facility, the process of designing, building and marketing a maintenance of way product is costly and time consuming.

*See* Tr. at 136–38; Tr. at 150. Further, although the various types of equipment compete for customers' budget dollars, Tr. at 127–28; 535, each piece of equipment performs a different maintenance function.[3]

This industry therefore differs from, for example, the airline and banking industries. In those industries, suppliers can shift their resources to provide different types of services with relative ease. An airline can cancel service to one city and add service to another without purchasing new equipment or investing in new research and development. A bank can shift its services from consumer loans to home mortgages or commercial loans with the same small investment. A railway maintenance of way equipment supplier, however, cannot shift its resources from producing tampers to producing some other type of equipment without incurring large research and development costs and equally large costs associated with converting its manufacturing facilities to produce the new product.[4] For these reasons, I find that it is inappropriate to define the relevant product market as the market for all maintenance of way equipment.

■ I further find that it is inappropriate to distinguish between "conventional" and "high-technology" automatic tampers in defining the relevant product market. The strongest argument defendants pose for this position is that executives of two major customers, Amtrak and Conrail, have indicated that they will confine their future tamper purchases to the "high-technology" tamper manufactured by Plasser. Tr. at 568. Mr. Glavin, Chief Engineer for the Burlington Northern Railroad, and Mr. McLaughlin, Assistant Vice President of Engineering for the Union Pacific Railroad, testified, however, that they would continue to purchase at least some conventional tampers. Tr. at 455–56; 477–78; 482–83. Although these executives testified that the Jackson Jordan 6700 and Tamper Mark III do not "compete" against the CAT, it is clear that all three machines perform the tamping function and that the major difference between them is their speed. Tr. at 440–41; 473–74. The defendants' expert witness testified that, for many customers, the 6700, Mark III and CAT are close substitutes, although she argued that the reverse was not always true, since some customers are increasingly looking to the CAT to satisfy their tamping needs. Tr. at 597–98; 685–87; 696–97. She further testified that the prices of conventional tampers do

---

3. Mr. Glavin testified, for example, that purchasers prepare both a general budget for the purchase of maintenance of way equipment, and a more specific budget which plans the purchase of various types of equipment. Once the companies have determined how many units of a particular machine they will buy, they solicit bids from the various suppliers to determine which firm will get their business. Tr. at 455, 458. Thus, while the various types of equipment compete against each other in the broad sense, for allocation of budget dollars toward their particular product, they also compete against each other within each class of products for specific sales.

4. The defendants' cluster argument relies, in part, on an assumption that there are no significant barriers to entry into the automatic tamper industry because suppliers of related products could shift their resources to the production of tampers with relative ease. Tr. at 650–51. This argument not only contradicts the testimony of Mr. Borsos and Mr. Kershaw, it also contradicts the defendants' justification for their proposed transaction. Mr. Short and Mr. Donahue testified that, without the joint venture, Jackson Jordan and Tamper would be unable to develop the technology needed to compete with Plasser's CAT, because the development of such a machine is costly and the return on that investment low. But if Jackson Jordan and Tamper, two firms already established in the market, are unable to compete independently, how could anyone expect a new firm to do so easily or even to enter the market in the first place? Further, although defendants' expert witness indicated that the customers could ease entry barriers by facilitating reverse engineering, Tr. at 604–05, she also admitted that this would not result in the development of a high technology tamper. Tr. at 707; 710–11. New entrants, even with customer assistance, could be expected to develop only a conventional tamper. But if the market for conventional tampers is about to disappear, why would new entry into that market be significant or operate as a restraint on collusive pricing? The defendants' entry argument simply doesn't make sense. Either entry into the market and effective competition is easy, in which case the joint venture is unnecessary, or it is difficult, in which case the joint venture is anticompetitive.

not constrain the prices for CATs, primarily because one CAT replaces several conventional tampers and because the CAT is perceived as a more efficient machine. Tr. at 597–98; 606–07; 696–97.

I find this argument unpersuasive, primarily because it appears to me that the price of conventional tampers must to some degree constrain the price of CATs. The clear import of Mr. Glavin's and Mr. McLaughlin's testimony was that their primary consideration in choosing maintenance of way equipment was efficiency. They choose among competing products based upon the product's ability to perform the desired function efficiently, thus decreasing the amount of time the track must be diverted from revenue creating operations. The CAT is preferred over the 6700 and Mark III, for certain uses, because it is faster and because, when used with a dynamic stabilizer, it reduces the need for slow orders. Thus, although the CAT has a higher purchase price, it is actually cheaper than conventional tampers because of its increased efficiency. If, however, the price of the CAT rose high enough to eliminate the cost savings associated with its greater efficiency and its ability to replace several conventional tampers, then the railroads would presumably discipline that price increase by purchasing a greater number of conventional tampers.

In short, the conventional and high-technology tampers perform essentially the same function. At present they compete against each other, as far as most customers are concerned, for sales. Although the trend may be toward greater purchases of high-technology tampers, no one testified that the need for conventional tampers would evaporate in the near future. Finally, the price of conventional tampers must, as a matter of common sense, constrain the price of the CAT, even if that constraint is only a weak one.

■ 2. *Geographic Market.* In this case, the relevant geographic market is not a matter of serious dispute. All three firms which produce automatic tampers manufacture and sell them in the United States. No firm has significant exports, although Jackson Jordan sells some tampers in Canada and Mexico. No firm imports automatic tampers into the United States. While there was some evidence that foreign manufacturers could enter the United States market in response to a price increase, there was also evidence that at least one of the two foreign manufacturers is controlled by Plasser, making it an unlikely entrant into this market. I conclude, therefore, that the effects of the proposed joint venture would be felt most directly and immediately within the United States, and that the United States is, therefore, the relevant geographic market. *See United States v. Philadelphia National Bank,* 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963).

■ 3. *Effect on Competition.* In order to prevail, the government must establish that the effect of the joint venture may be to substantially lessen competition in the market for automatic tampers in the United States. In assessing the competitive effects of a particular transaction, courts routinely consider the level of concentration in a particular market and the market shares controlled by each of the transacting firms, both before and after the proposed transaction. A transaction which would result in further concentration in an already highly concentrated market may be regarded as presumptively illegal under Section 7. In *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), the Court held that a merger resulting in a single firm controlling 30 percent of a market in which four firms controlled 70 percent of the sales was presumptively illegal. The Court reasoned:

[A] merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in the market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effect.

*Id.* at 363, 83 S.Ct. at 1741.

Subsequent cases have followed *Philadelphia National Bank*'s presumptive il-

legality approach, and have enjoined transactions where the resulting market shares and market concentration levels were lower than those involved here. *See United States v. Continental Can Co.*, 378 U.S. 441, 461, 84 S.Ct. 1738, 1749, 12 L.Ed.2d 953 (1964) (aggregate market share 35%; acquired firm's market share 3.1%; four-firm concentration ration 64.7%); *United States v. Alcoa (Rome Cable)*, 377 U.S. 271, 278, 280, 84 S.Ct. 1283, 1288, 1289, 12 L.Ed.2d 314 (1964) (aggregate market share 29.1%; acquired firm's market share 1.3%; four-firm concentration ratio 76%); *Hospital Corp. of America*, 807 F.2d at 1384 (7th Cir.1986), *affirming* 106 F.T.C. 361, 488 (1985) (acquisition increased market share of second largest firm from 14% to 26% with post-acquisition HHIs from 2416 to 2634), *cert. denied*, 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987); *PPG Industries*, 798 F.2d at 1503 (four-firm concentration ration of 80%); *FTC v. Warner Communications*, 742 F.2d 1156, 1164 (9th Cir.1984) (four-firm concentration ration of 75%); *FTC v. Coca-Cola Co.*, 641 F.Supp. 1128, 1134 (D.D.C.1986) (two-firm concentration ration of 66.3% and post-acquisition market shares equivalent to HHI of 2650); *Marathon Oil Co. v. Mobil Corp.*, 530 F.Supp. 315, 326 (N.D. Ohio) *aff'd* 669 F.2d 378 (6th Cir.1981), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982); *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F.Supp. 1250, 1265 (E.D.Pa.1987) (HHIs ranging from 2474 to 5197).

The joint venture at issue here would result in concentration levels much higher that those considered presumptively illegal in *Philadelphia National Bank.* Only three firms currently produce automatic tampers in the United States. At present, Ivaco, through Tamper, controls 45 percent of sales. Jackson Jordan controls 25.1 percent of sales, and Plasser controls 29.9 percent. The joint venture would create one firm controlling 70.1 percent of the market. Two firms would control 100 percent of the market. Measuring market concentration with the Herfindahl–Hirschman Index (HHI) preferred by the government, concentration in the market would increase from the present HHI of 3549 to a post-transaction HHI of 5809.[5] By any standard of measurement, the proposed joint venture would result in further concentration of an already highly concentrated market.

In addition to high concentration, this market is characterized by vigorous price competition between the three firms, and especially between Jackson Jordan and Tamper. *See*, PX 7–11, 22–25; Tr. at 254–60.[6] Mr. Donahue testified that, in 1981, Tamper began to cut prices and offer discounts in an effort to gain market share and force Jackson Jordan out of business. Tr. at 509–512; 519–23. The effort was unsuccessful, because Jackson Jordan responded by refusing to increase its own prices and offering similar discounts on volume sales. Tr. at 510–11. Jackson Jordan's chief financial officer often referred to this situation as a "price war," although there is no indication that either firm ever sold its products below cost. Tr. at 511. Although the per unit price of automatic tampers appears to have increased during this time period, neither Jackson Jordan nor Tamper made a profit on their tamper products, and for Jackson Jordan, the losses increased between 1982 and 1987. DX 7; Tr. at 499; 566; Tr. at 362; 381; 382. Jackson Jordan and Tamper regard each

---

5. The Department of Justice's Merger Guidelines characterize a market as unconcentrated if its HHI is below 1,000. A market is moderately concentrated if its HHI is between 1,000 and 1,800. A market is highly concentrated if its HHI is above 1,800. An HHI of 1,000 corresponds roughly to a four-firm concentration ratio of 50 percent. United States Department of Justice Merger Guidelines § 3.1 (1984), reprinted in 4 Trade Reg.Rep. (CCH) ¶ 13.103.

6. Mr. Donahue denied that a "price war" existed, in the sense that Tamper and Jackson Jordan never sold their products below cost, Tr. at 511, but he acknowledged that severe price competition between the two firms hurt Jackson Jordan's profits in the years between 1982 and 1987. Mr. Short, former president of Canron Industries, Tamper's parent company, testified that while the two firms have "competed aggressively with each other," neither had adopted a policy of "destructive price competition." Tr. at 382.

other as their primary competitor in the automatic tamper market. Tr. at 507.

The automatic tamper market is also characterized by significant barriers to entry by new firms. Executives from firms in related maintenance of way industries testified that, while they have considered entering the automatic tamper market, they have declined to do so because of the high costs associated with entry and because the existing suppliers presently control the market. Tr. at 136–38; 140–41; 147; 149–50. One executive testified that entry into the automatic tamper market would cost between two and three million dollars and would take about three years. Tr. at 136–38. Another executive testified that development of a competitive automatic tamper would take between three and five years and cost three to five million dollars. Tr. at 147; 149–50. Entry into the market by firms in related maintenance of way industries would be easier than entry by firms in unrelated fields. Tr. at 706. In order to justify entry, the entrant would have to develop a machine that surpasses those currently on the market. Entry with a comparable machine would not make sense because the existing suppliers can satisfy customer demand. Tr. at 128. Jackson Jordan, a firm which already products automatic tampers, estimates that it would take approximately three years and cost between $2.5 and $3 million dollars to develop a technologically advanced automatic tamper capable of surpassing the efficiency of the Plasser CAT. Because entry into the automatic tamper market with a competitive product, even by firms in related industries, would be costly and time consuming, I conclude that the threat of entry by new firms would not pose a significant constraint on price increases in the market for these machines. *See, United ed States v. Waste Management, Inc.,* 743

F.2d 976, 983–84 (2d Cir.1984). *See also* note 4, *supra.*

The proposed joint venture would combine both firms' maintenance of way operations into a single firm, owned equally by Jackson Jordan and Tamper. PX 19; Tr. at 394–95. Further, the firms would agree not to compete with the joint venture in the maintenance of way industry. PX 19. The resulting firm would control 70 percent of the market for automatic tampers. The existing price competition between Jackson Jordan and Tamper would cease. Given the high concentration in the market as a result of the joint venture, the fact that each firms' pricing has been responsive to the others' and that prices have remained below profitable levels for the past several years, I find it only logical to conclude that the effect of the joint venture, absent significant mitigating factors, would be an increase in the price of automatic tampers.[7] I find, therefore, that the government has established a *prima facie* case that the joint venture would violate Section 7. *See Kaiser Aluminum & Chemical Corp. v. FTC,* 652 F.2d 1324, 1341 (7th Cir.1981) (market concentration statistics the "primary index for measuring market power and, if they are unrebutted, those statistics standing along can support a finding of a § 7 violation").

■ 4. *The General Dynamics Defense.* The government's statistical proof, especially when taken together with its proof of vigorous price competition between the defendants, is sufficient to establish a *prima facie* case under Section 7. The burden now shifts to the defendants "to show that market share statistics [give] an inaccurate account of the acquisition's probable effects on competition." *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 120, 95 S.Ct. 2099, 2118, 45 L.Ed.2d

---

**7.** It is also important to note that consumers have no functional substitute for automatic tampers. Thus, it would be difficult for them to discipline a price increase by purchasing substitute products. In addition, as I noted earlier, there are significant barriers to entry by new firms into this market. The cost to develop and produce an automatic tamper would be high, even for a firm in a related industry, and the

return on that investment would be low. There is no significant threat that imports would enter the market to hold down prices. Thus, the likely result of this joint venture would be to eliminate the two biggest competitors in the market with little hope that consumers could prevent a price increase by purchasing substitute products or that additional suppliers could enter the market to accomplish the same result.

41 (1975); *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 631, 94 S.Ct. 2856, 2874, 41 L.Ed.2d 978 (1974); *United States v. General Dynamics Corp.*, 415 U.S. 486, 497–98, 94 S.Ct. 1186, 1193–94, 39 L.Ed.2d 530 (1974). The so-called *General Dynamics* defense, then, allows defendants to rebut the government's statistical evidence of anti-competitive effects by non-statistical evidence establishing that "pertinent factors affecting the ... industry and the business of the [defendants] mandate[ ] a conclusion that no substantial lessening of competition occurred or was threatened by the acquisition...." *General Dynamics*, 415 U.S. at 498, 94 S.Ct. at 1194.

The *General Dynamics* "market realities" approach has been followed by several lower federal courts, and these courts "have tended to be more lenient towards horizontal mergers than would have been true in the Warren Court era." 4 VonKalinowski, *Antitrust Laws & Trade Regulation* ¶ 19.03[2] at 19–140 (1988). Horizontal mergers are still viewed with suspicion by the courts, however, and several post-*General Dynamics* cases have held such mergers to violate the Clayton Act where the evidence of "market realities" was insufficient to rebut the government's prima facie case. *See Marathon Oil Co. v. Mobil Corp.*, 669 F.2d 378, 382 (6th Cir.1981) (noting that "Any conceivable benefits are more than offset by the potential elimination of Marathon as a supplier" to independent dealers competing with brand-name gasoline companies in the retail market); *RSR Corporation v. FTC*, 602 F.2d 1317, 1325 (9th Cir.1979) (rejecting the argument that, "even if some anticompetitive effects are felt as a result of the merger, competition in the overall ... market will increase because the enlarged RSR will be better able to compete with the industry giant ..."); *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 312 (7th Cir.1976) (finding that an increase in the number of competitors did not negate conclusion that market was highly concentrated); *FTC v. Food Town Stores,*

*Inc.*, 539 F.2d 1339, 1345 (4th Cir.1976) (finding evidence of acquired firm's poor financial condition insufficient to rebut case where acquisition would give acquiring firm virtual monopoly in relevant market).

Three cases accepting the *General Dynamics* defense are relevant to our inquiry, *United States v. International Harvester Co.*, 564 F.2d 769 (7th Cir.1977); *FTC v. National Tea Co.*, 603 F.2d 694 (8th Cir. 1979); and *Kaiser Aluminum & Chemical Corp. v. FTC*, 652 F.2d 1324 (7th Cir.1981).[8] *International Harvester* concerned the acquisition by International Harvester of 39% of the stock of Steiger Co. The government contended that this acquisition would reduce competition in the market for production and sale of four-wheel drive farm tractors in the United States. At the time of the acquisition, Stieger produced and marketed its own line of tractors, and also manufactured tractors for its four major competitors, including International Harvester.

The market for production and sales of these tractors was highly concentrated, with the top four firms controlling 83% of the sales. At the time of the transaction, Steiger was in precarious financial condition. Although it had many production contracts, it did not have sufficient production capacity, and had exhausted its ability to receive credit through normal channels. Efforts to raise capital by private and public stock offerings failed, until International Harvester agreed to purchase 39% of the firm's stock.

The firms simultaneously executed a stock purchase agreement and a manufacturing agreement. The stock purchase agreement allowed International Harvester to appoint three of the nine members of Steiger's board of directors, but prevented International Harvester from interfering with Steiger's "financially sound business activities." *Id.* at 777. The manufacturing agreement provided that Steiger would continue to produce tractors under its own

---

**8.** *United States v. Waste Management, Inc.*, 743 F.2d 976 (2d Cir.1984) also accepted a *General Dynamics* defense, but relied almost exclusively on ease of entry into the market, a factor not presented in our case.

brand, and for the remaining competitors. International Harvester was obligated to purchase an increased number of tractors over a six-year period, but could never purchase more than 52% of Steiger's total output.

The court found that International Harvester had no intent to purchase additional Steiger stock in the future, or to control Steiger's business activities. It further found that the arrangement allowed Steiger to become a stronger competitor by allowing it to retire its factored financing, establish normal lines of credit, build a new plant, increase production capacity and enter foreign markets. Steiger's share of the market actually increased as a result of the transaction. The court further found that competition between Steiger and International Harvester was intense and could be expected to remain at that level or increase after the transaction. The Seventh Circuit concluded that evidence of Steiger's weakened financial condition, together with evidence indicating that the transaction would actually increase competition in the market, was sufficient to rebut the government's prima facie case of a Section 7 violation.

In *Kaiser Aluminum & Chemical Corp. v. FTC*, 652 F.2d 1324 (7th Cir.1981), the court rejected the argument that *International Harvester* had created a new "weakened company" defense to a Section 7 action. The financial weakness of the acquired firm was, in the court's view, only one of several factors to be considered where a Section 7 defendant offers non-statistical evidence to rebut the government's claim. Financial weakness may show that statistics measuring post-acquisition concentration in a market inaccurately portray the effect of the acquisition on competition within that market. *Id.* at 1338. Other relevant factors include: (1) whether the acquiring firm would control the other's business activities; (2) whether the transaction would allow the acquired firm to become a variable competitor in the market; (3) whether, after the transaction, the two firms would remain in competition with each other; and (4) whether the trend in the industry was toward or away from further concentration. In *International*

*Harvester*, the evidence showed a trend against further concentration.

The *Kaiser* court reaffirmed that market concentration statistics are still the "primary index for measuring market power and, if they are unrebutted, those statistics standing alone can support a finding of a § 7 violation. The market concentration statistics, however, must be relevant to the focus of competition. The statistics must be an accurate measure of future ability to compete in a relevant market." *Id.* at 1341. Statistical evidence may be rebutted with non-statistical evidence which "casts doubt on the persuasive quality of the statistics to predict future anti-competitive consequences ..." of a particular transaction. *Id.* The court noted that other relevant factors to be considered include ease of entry into the market, the trend toward concentration in the market, and whether the transaction would encourage a "continuation of active price competition" between the firms involved. *Id.*

*FTC v. National Tea Co.*, 603 F.2d 694 (8th Cir.1979), involved a horizontal merger of two retail grocery store chains operating in the Minneapolis–St. Paul area. National was in weak financial condition, having sustained heavy losses over the previous five years. It contended that it would leave the Minneapolis–St. Paul market if the merger was enjoined. The district court found that, while the merger would increase the acquiring firm's market share and increase concentration in the market, concentration would also increase if the merger were enjoined and National left the Minneapolis–St. Paul market. The Eighth Circuit affirmed this reasoning:

> In examining the imminent departure of National from the relevant market and the increased concentration that would result, the District Court was merely scrutinizing the "probable future" of the market. Obviously, if National had experienced such serious marketing problems in the ... area that it was leaving the area, its present market share was an inaccurate reflection of its future competitive strength. Moreover, when examining a merger, a court must neces-

sarily compare what may happen if the merger occurs with what may happen if the merger does not occur. The prospective loss of National from the relevant market if the merger is enjoined is a relevant factor in this comparison. *Id.* at 700.

The court was also swayed by evidence that competition would remain intense in the relevant market, since Minneapolis–St. Paul not only had a number of larger grocery chains, but also a healthy second-tier of independently owned stores. The court noted that acquisition of the weak firm could backfire, and drag down the healthy firm. Given the evidence of continued competition, however, the court concluded that, "even if National is able to maintain its statistical position after the merger, it will still be faced with vigorous competition from the two other leading firms as well as from the strong and growing second-tier firms." *Id.* at 701. Finally, the court was impressed by evidence indicating that, while the post-merger concentration would be high, it would be almost exactly as high if the merger were enjoined and National Tea left the area. The court concluded, therefore, that the merger would not substantially lessen competition in the relevant market.

In this case, the defendants argue that a number of factors mandate the conclusion that their joint venture will not tend to lessen competition in the market for automatic tampers. First, the defendants argue that both Jackson Jordan and Tamper are financially weak companies, competing in an industry which has been characterized by increased costs, declining demand, and stable, if not increasing, prices. Because the firms' major customers, the Class I railroads, demand improved sophistication and efficiency in tampers, they have shown

a tendency to purchase the most technologically advanced products available on the market, in this case, the Plasser CAT. The defendants conclude that their transaction will actually increase competition in the tamper market because it will allow for the development of a high technology tamper better able to compete with the Plasser CAT. Defendants estimate that development of such a machine will cost between $2.5 and $3 million dollars and take approximately three years. Tr. at 491. Without the joint venture, the firms would be unable, or at least unwilling, to finance that development. The joint venture would allow them to pool their research and development resources and their complementary engineering skills.[9] The defendants further suggest that development of sophisticated tamping equipment would allow them to enter foreign markets previously dominated by Plasser. Thus, the defendants conclude that, with the joint venture they will be able to produce a product more responsive to consumer demand and more competitive with Plasser. Without the joint venture, they argue that at least one firm will be forced to leave the market, and Plasser will continue to enjoy a monopoly in the high technology tamper "market."

The defendants also argue that their major customers are strongly in favor of the joint venture. *See* DX 1; Tr. at 442–43; 474–76; 604–07. The railroads believe that, if the joint venture is allowed, the new firm will develop a "high technology" tamper competitive with the CAT. They believe that prices for tampers will not increase for several reasons: Plasser would hold prices down; the railroads would defer new purchases and recondition or maintain their existing tampers; the railroads could finance entry by a competing firm through reverse engineering.[10]

---

**9.** With the exception of tampers, Jackson Jordan and Tamper's maintenance of way product lines are entirely complementary. The firms' engineering strengths also appear to be complementary, since Jackson Jordan excels in electronics while Tamper has better machining skills. Tr. at 494.

**10.** The defendants' expert witness also contended that sales of used tampers and leasing of

tamper services from independent firms could constrain a price increase. Tr. 600–603; DX 34, 35. I find this testimony unpersuasive for several reasons. First, there was no showing that the used equipment sellers actually market used automatic, as opposed to manual, tampers. Tr. at 734–35. Second, the availability of used tampers depends, in part, upon the availability of replacement parts needed to recondition the equipment. These parts are proprietary and are

Tr. at 443; 475–76. In light of this consumer support, the defendants suggest that there is no reason to be suspicious of their joint venture. The joint venture will give consumers what they want—a domestic competitor for Plasser and better products—and consumers will, for the reasons stated above, be able to prevent any abusive price increases.

Finally, the defendants argue that the government's fears of anticompetitive effect are based upon a collusion model which has no application to the facts of this case. The collusion model suggests that where only a few firms produce homogenous products, and recognize that their economic fortunes are interdependent, the firms will maximize their profits by agreeing to increase prices. The defendants argue that this model has no application to the tamper market because: the various products are not homogenous; Plasser has no incentive to collude in a price increase because that increase would only strengthen the joint venture's ability to compete; the parties would be unable to police cheating since most sales are accomplished through sealed bids; and collusion could be prevented by the entry of new firms into the market or defensive behavior by the railroads.

Like the government's expert witness, I remain skeptical of the defendants' claims. I find no reason to doubt the defendants' claim that the market for tampers is shrinking and that, faced with relatively stable prices, high overhead and persistent losses, one firm or the other may eventually exit the tamper market. This fact, however, does not necessarily justify the clear anticompetitive effects of the joint venture. As the court found in *Kaiser Aluminum*, "Financial weakness, while perhaps relevant in some cases, is probably the weakest ground of all for justifying a merger." *Id.* 652 F.2d at 1338. Further, the evidence showed that both firms, as a whole, remain profitable enterprises, even if their tamper businesses are not.[11] Neither firm has plans to discontinue its tamper business, although Canron may contemplate discontinuing or selling the business if the joint venture is enjoined. Tr. at 557–58; 370–71; 404. Both firms anticipate that they will be able to sell tampers in the future and Jackson Jordan has at least one long-term contract for the sale of tampers. Tr. at 477–78; 547. Thus, while the firms may not be as profitable as they would like to be, and while a general decline in the industry may, at some point, cause one firm to exit the market resulting in further concentration, the evidence did not show that exit by either firm was imminent or inevitable.[12]

produced only by the defendants. Tr. at 724. Sales of parts are one of the most profitable enterprises for the defendants. Tr. at 521, 812. Thus if used tampers became more popular, the defendants could make up for losses on sales of new tampers by increasing the price of replacement parts. Tr. at 812. Third, used tampers were not shown to have operated as a pricing constraint in the past. Leasing firms would, of course, have to acquire their equipment from the defendants and would pass price increases on to their customers. Tr. at 813.

11. Canron Industries, Tamper's parent company, reported net earnings of $5.3 million dollars in 1987. PX 16. Canron's parent company, Ivaco, reported net earnings in excess of forty-four million (Canadian) dollars in the same year. Tr. at 402. Jackson Jordan earned a profit in 1988 and would have earned a profit in 1987 but for extraordinary legal expenses associated with patent litigation. Tr. at 563–64.

12. The case thus differs substantially from both *International Harvester* and *National Tea Co.,* in that the evidence of competitive weakness is simply not as strong here as it was in those cases. For example, neither Jackson Jordan nor Tamper has engaged in the kind of extreme borrowing at issue in *International Harvester,* nor is either firm plagued by inadequate capacity to meet existing contracts. *See International Harvester,* 564 F.2d at 776–76. In *National Tea,* the acquiring firm had sustained heavy losses for five years, had engaged in numerous efforts to boost sales and was plagued by negative consumer recognition. The court agreed that the firm's exit from the market would be "imminent" without the proposed transaction. *National Tea,* 603 F.2d at 700. In addition, the court noted that the acquired firm would face substantial competition from other grocery chains and from a strong tier of independently owned stores. None of those factors are present in our case. While the firms may have lost money on their tamper products, neither has sustained heavy losses on the whole, and there was no evidence indicating that either firm would immediately exit the market if the joint venture is enjoined. Finally, there is no showing that the joint venture would face competition from anyone other than Plasser.

*See,* Tr. at 520; 730. The evidence of weakened financial condition and a shrinking market is insufficient to demonstrate that the firms' past performance is an unreliable indicator of their future ability to compete. *See Kaiser Aluminum,* 652 F.2d at 1338; *National Tea,* 603 F.2d at 700; *International Harvester,* 564 F.2d at 773–74.

Moreover, even if I were to accept the argument that one of these firms will, in fact, leave the tamper market, I would not find that sufficient to justify the joint venture. As Dr. Pittman argued, the firms will continue to compete for a period of time before one firm departs. The customers will, during that period, benefit from competitive pricing. If neither firm decides to exit the market, customers will continue to benefit from competition. If one firm or the other leaves the market, its assets could be sold to a firm in a related industry, and competition would presumably continue. Tr. at 816–17. The market would become a monopoly or "duopoly" as a result of natural market forces, something which the antitrust laws are not necessarily designed to prevent. But consumers would benefit from the competition preceding either firms' exit and the resulting market structure would indeed be "natural," in the sense that it would be the product of competition, rather than the product of a transaction between the two biggest competitors in that market. Tr. at 302–03.[13]

I am also unpersuaded by the defendants' argument that the joint venture is somehow necessary to the development of a high technology tamper. I do not doubt that it is, financially, the best alternative for these firms, but I am not convinced that they will be incapable of competing against the Plasser CAT without the joint venture. First, there are a number of alternative transactions which would not have the same anticompetitive effects as this one but would allow for the development of a new tamper. The firms could enter into a joint venture with a railroad company or with a firm in a related maintenance of way industry.[14] There was no evidence that either firm ever seriously considered these alternatives nor did the defendants attempt to explain why the alternatives are impractical or even unattractive. The firms could finance the necessary research and development on their own, either through borrowing or through revenues from other products.[15] Also, the

---

This case also differs from *FTC v. Great Lakes Chemical Corp.,* 528 F.Supp. 84 (N.D.Ill.1981). In that case, the acquired firm had essentially abandoned its relevant business by discontinuing research and development efforts and basic maintenance of its production facilities. *Id.* at 91, 96–97. The court found that the acquired firm met the elements of the "failing company" defense, *id.* at 87, that entry into the product market was easy, *id.* at 90, and that the acquiring firm would face substantial competition from a number of firms even if the merger was consummated. *Id.* at 90. These factors are simply not present in this case. Neither Jackson Jordan nor Tamper can be characterized as a failing company, nor has either firm abandoned their tamper business. Further, while there were no high barriers to entry present in *Great Lakes,* those barriers do exist in this case and the prospect of intense competition either from new entrants or from Plasser is not strong.

13. I note further that there was no evidence indicating what the resulting market structure and concentration levels would be if one firm left the market. In *National Tea,* the court was influenced by evidence indicating that concentration in the market would be roughly the same if the merger occurred as it would be if the merger was enjoined and one firm left the market. 603 F.2d at 701. Here, we have less convincing evidence that either firm will exit the market, and we have no evidence suggesting how the market would be affected by that exit.

14. Indeed, there was evidence that both firms had rejected such offers. Burlington Northern, for example, offered to aid Tamper in the development of a new tamper product, but the venture never got beyond the offer stage, because Tamper was not interested. Tr. at 460–61; 395–96. Similarly, other firms have expressed a desire to acquire Tamper and Jackson Jordan, or be acquired by them, offers which have always been refused. Tr. at 153–56; 549–50. Jackson Jordan has never sought research and development funds from Burlington Northern. Tr. at 461. Neither firm has sought assistance from Union Pacific. Tr. at 485.

15. Jackson Jordan has, in the recent past, used its own funds to develop new products. Tr. at 500. It recently spent approximately four million dollars on the development of a switch and crossing grinder. Tr. at 564. This amount is less than the projected expense of developing a

firms could have considered a more limited transaction between themselves—a joint venture for the express purpose of developing a high technology tamper which would leave their respective conventional tamper businesses and other product lines independent.

One of the principal considerations justifying the acquisition at issue in *International Harvester* was the fact that the firms would remain essentially independent entities—they would continue to compete with other firms in the market and with each other even after the acquisition took place. The transaction was structured so that neither firm could control the other's daily business activities. Based on these factors, the court was able to conclude that the acquisition would not only strengthen the acquired firm as a competitor, it would actually increase the level of competition in the industry. *International Harvester,* 564 F.2d at 778–79. Because the firms would continue to compete against each other, the court found no reason to suspect that the fierce price competition in the industry would decline, and in fact predicted that price competition would increase. *Id.* Finally, the court concluded that the present transaction "was reasonably regarded as the *only practicable* source" of financing for the acquired firm. *Id.* at 779 (emphasis in original).

The transaction at issue in our case is dramatically different. The parties appear to have carefully chosen a transaction which will completely eliminate price competition between them in the tamper market, and which will destroy their independent entities. Further, the market here is even more heavily concentrated than the market at issue in *International Harvester.* While one can perhaps expect continued price competition from Plasser, the joint venture would still control 70 percent of the market, and perhaps more if its new product is as successful as the defendants hope.

The joint venture agreement does not obligate the joint venture to develop a high technology tamper. PX 19. While I do not doubt that the defendants intend in good faith to do so, there is no assurance that they will. The defendants carefully demonstrated to the Court that the market for tampers is shrinking, that the industry faces high overhead costs and persistent losses and that neither firm would consider investing in the development of a new tamper if it had to do so independently. Mr. Donahue testified that, even if one firm controlled the entire market, it could not make a profit solely on the sale of tampers. Tr. at 506. Further, there was evidence that sales of CATs would be low in the coming years and, even if one accepts the defendants' projections, sales will be lower than they were when the CAT was first introduced. So, if I am to believe the defendants' scenario, I have to assume that a firm in a declining market facing low sales and high costs would spend millions simply to stay in that market. But, accepting the defendants' representations about the market's future, it seems equally likely that the joint venture, like its individual parents, will decline to invest in the development of a high technology tamper.

Given the number of less-competitive alternatives open to the defendants, and their pessimistic forecasts for the market's future, it becomes clear that the defendants chose this particular transaction because it was the only way to eliminate the fierce price competition between Jackson Jordan and Tamper. This price competition has kept prices relatively stable in recent years and prevented the tamper lines from covering their share of fixed costs. The manufacture and sale of the new tamper would involve the same high costs. The defendants claim that, independently, they would be unable to develop the new machine. If this is true, it must be because the parties could not support the development costs while encountering price competition for

---

high technology tamper. *Id.* Jackson Jordan is apparently reluctant to finance the tamper project because it believes that the return on the investment would be insufficient to justify it. Tr. at 565. Canron appears reluctant to finance

development efforts by Tamper due to a series of failed development projects resulting in heavy losses. Tr. at 421–22. Canron and Ivaco also appear to believe that the project's profits would not justify its cost. Tr. at 370–72.

their current products. They claim that the joint venture will be able to afford the development costs without additional investment by either firm, because of the cost savings it will generate.[16] I am unpersuaded that these cost savings would, in fact, be high enough to fund the development of the new machine without the imposition of price increases on the current products. In short, I do not accept defendants' representations that the "efficiencies" generated by the joint venture would allow it to develop a new tamper without engaging in the anticompetitive behavior forecast by the government.

The defendants also argue that the joint venture is desirable because it will allow the firm to become an exporter of tampers to the European market, now apparently monopolized by Plasser. First, I find this argument irrelevant. Procompetitive effects outside the relevant geographic market cannot be used to offset anticompetitive effects in the relevant market. *Philadelphia National Bank*, 374 U.S. at 370–71, 83 S.Ct. at 1745–46; *Mississippi River Corp. v. FTC*, 454 F.2d 1083, 1089 (8th Cir.1972). Second, the defendants failed to produce evidence indicating that they could surmount the significant barriers to entry into the European market. Mr. Short testified that Plasser essentially dominates this market, and that the various European railroads have different requirements for maintenance of way equipment than those of domestic railroads. Tr. at 389–90.

The defendants' most persuasive argument is that the major customers for automatic tampers support the joint venture and are not concerned that the combined entity could impose a significant price increase upon them. Representatives of two major railroads testified that, if the joint venture develops a product to compete with the Plasser CAT, prices in the automatic tamper market could be expected to decrease. They further testified that the railroads had several means at their disposal to constrain price increases by the joint venture including: purchasing from Plasser, deferring new purchases and maintaining existing machines, rebuilding existing machines through the help of independent contractors and financing a competitor's entry into the market through reverse engineering and other assistance.

In *FTC v. Great Lakes Chemical Corp.*, 528 F.Supp. 84 (N.D.Ill.1981), the court noted that, "A key factor to consider in analyzing whether the proposed acquisition will violate Section 7 is the impact of the transaction on ... customers." *See also United States v. Tidewater Marine Service, Inc.*, 284 F.Supp. 324, 338 (E.D.La. 1968) (effect on customers relevant when measuring anticompetitive effects of merger). In *Great Lakes* the customers agreed that the acquisition would leave the market with three strong, aggressive competitors, phasing out a firm whose supplies were unreliable and overpriced. *Id.* at 95. Because of the acquired firm's deficiencies as a supplier, it had lost most of its significant contracts and was found to be a failing firm. *Id.* at 97–98. The acquiring firm, on the other hand, had a history of aggressive pricing, but was under supplied. *Id.* at 95. The transaction allowed it to become a supplier rather than a purchaser. Thus, the transaction would increase the number of satisfactory suppliers in the market, thereby increasing competition rather than decreasing it. *Id.*

---

**16.** The defendants expect the joint venture to generate approximately four million dollars in cost savings, enabling it to fund the development of a new tamper without increasing the present research and development *commitment* of either firm. Jackson Jordan's current product development budget is about $400,000. Tr. at 496. The only evidence of the cost savings and profits to be achieved by the joint venture was a preliminary estimate prepared by Mr. Donahue. Tr. at 550–52. He estimated the joint venture's potential profits at between twelve and twenty-two million dollars, although Mr. Short never agreed with that estimate. Tr. at 550; 552. Mr. Short testified that preliminary estimates had been made but declined to quantify the expected savings. Tr. at 411–12. A study prepared by Ernst and Whinney indicated that the joint venture could generate between four and seven million dollars in cost savings, if the new firm closed one of its two plants. Since the joint venture intends to leave both plants open, it will not achieve this large cost saving unless it generates significant new volume in an industry thought to be shrinking. Tr. at 556.

The court in *Great Lakes* did not give weight to the customers' predictions simply because the predictions came from customers. Rather, it gave weight to the customers' predictions because those predictions were supported by the evidence. In this case I find that the customers' opinions, while significant, are insufficient to offset the evidence of potential anticompetitive effects. First, the customers base their support for the joint venture on the assumption that the venture will, in fact, develop a new tamper. As I indicated above, I do not believe that this prediction is necessarily accurate. Second, the customers' ability to discipline a price increase by maintaining or rebuilding existing machines is heavily dependent upon the supply of replacement parts. The defendants are the only individuals who can supply those parts, and sales of replacement parts are a profitable part of their business. The customers would be forced to turn to the firm they are attempting to discipline in order to purchase replacement parts, and in doing so would be refueling one of the most profitable enterprises that firm has. As Dr. Pittman testified, this cannot be a particularly effective punishment for anticompetitive behavior. Tr. at 812–13.

Third, even with the assistance of a major railroad, the barriers to entry into the tamper market are significant. Tr. at 136–38; 150. In order for the railroads to consider such a transaction, they would have to experience either significant price increases or serious product deficiencies, competitive injuries which can be avoided if the defendants are required to remain in competition with each other. Further, it seems to me that the defendants' reliance on ease of entry places their justification for the joint venture—that it is necessary to fund development of the new tamper—in

some doubt. If other firms could develop a competitive tamper swiftly and inexpensively enough to prevent the joint venturers from increasing prices, then the defendants should have the ability to develop a new tamper without the joint venture.

Finally, I am unconvinced that Plasser lacks an incentive to engage in collusive pricing with the joint venture. The incentive, of course, is profit maximization. Defendants argue that the disincentive—preventing the joint venture from developing a new tamper—is just as strong, because Plasser has a strong interest in maintaining its monopoly over high technology tampers. As Dr. Pittman pointed out, however, price cutting would be a "very blunt instrument to prevent someone from entering the CAT market. . . ." Tr. at 822. Plasser would have to forego earning artificially high profits on its conventional tampers in order to prevent the joint venture from acquiring the funds necessary to compete with the CAT. That strategy is unlikely to work, because the joint venture could acquire funds from other sources.[17] Thus, Plasser has every incentive to join in a price increase and can be expected to do so.[18]

In short, I find that the defendants have failed to produce sufficient evidence to rebut the government's *prima facie* case under Section 7. While it appears that the joint venture may have some procompetitive prospects, those prospects are simply insufficient to counter the government's strong evidence that the joint venture would lessen competition in the automatic tamper market. The defendants have failed to demonstrate that the government's statistical evidence inaccurately portrays the market's future. They have argued that, because technological innova-

---

17. If, as defendants argue, development of a new tamper is necessary to the firms' survival, then they could be expected to finance the project even if Plasser cut its tamper prices.

18. The defendants' remaining arguments against the application of a collusion model are equally unpersuasive. First, although the firms' products are not perfectly homogenous, they are close substitutes. The products are homogenous enough to allow for collusion among sup-

pliers. Second, with only two firms in the market, the firms would be able to police cheating, or non-collusive pricing by their competitor. Assuming the products are close substitutes, the firms would know that they lost sales based on their competitor's price-cutting. Finally, as I indicated above, I do not believe that entry into the market is sufficiently easy to constrain collusive pricing.

tions will soon make their existing products obsolete, and because they have been unable to match Plassers' innovative products, their past dominance of the tamper market does not suggest an ability to continue that dominance in the future. Although the evidence demonstrated that customers are indeed interested in purchasing technologically advanced products, it did not demonstrate that the market for more conventional products had disappeared or could be expected to do so in the near future. Also, the evidence shows that the defendants are not obligated by their agreement to actually produce a technologically advanced tamper, and that they have rejected less anticompetitive alternatives for funding the development of such a product. In light of the evidence showing a general decline in the tamper market, I remain unconvinced that the joint venture would, or could, develop a technologically advanced tamper without the aid of price increases made possible by the high concentration in the market. Further, I find that entry into the market is not so easy that it could pose a significant restraint to price increases and that the joint venture's only competitor, Plasser, does in fact have an incentive to join in such an increase. For these reasons, I believe that the government's statistical evidence accurately portrays the future of the market, and indicates that the joint venture would have anticompetitive effects. I find, therefore, that the government has established a substantial likelihood of success on the merits of its Section 7 claim.

### Irreparable Harm

■ Irreparable harm is presumed where the government has established a substantial likelihood of success on the merits in an action to enforce Section 7. *United States v. Ingersoll–Rand Co.*, 320 F.2d 509, 624 (3d Cir.1963); *United States v. Wilson Sporting Goods Co.*, 288 F.Supp. 543, 567 (N.D.Ill.1968). This is so because, "the threatened violation of the law here is itself sufficient public injury to justify [injunctive] relief. The Congressional pronouncement in § 7 embodies the irreparable injury of violation of its provisions."

*United States v. Ingersoll–Rand Co.*, 218 F.Supp. 530 at 544. *See also United States v. PPG Industries*, 798 F.2d 1500, 1506 (D.C.Cir.1986) (where transaction violates § 7, district court faces a "difficult task in justifying anything less than a full stop injunction"); *Marathon Oil Co. v. Mobil Corp.*, 530 F.Supp. 315, 320 (N.D.Ohio) *aff'd*, 669 F.2d 378 (6th Cir.1981), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982) (possible elimination of effective competitor sufficient to establish irreparable harm); *Allis–Chalmers Manufacturing Co. v. White Consolidated Industries*, 414 F.2d 506, 511 (3d Cir.1969), *cert. denied*, 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970).

If an injunction is denied and the transaction is later found to violate the Act, then the remedy would be a divestiture of acquired assets by the joint venture. That remedy is typically rejected by the courts as ineffective. "If injunctive relief is not awarded and the merger is subsequently found to be unlawful, it would be extremely difficult, if at all possible, to remedy effectively the unlawful merger." *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 600 F.Supp. 1326, 1332 (E.D. Mich.), *aff'd*, 753 F.2d 1354 (6th Cir.1985).

In this case, I find that irreparable harm would occur if the preliminary injunction is denied. Consummation of the joint venture would eliminate competition between two fierce competitors in an already highly concentrated industry. The government has established to my satisfaction that the joint venture would have anticompetitive effects and would result in increased prices for automatic tampers in the United States. Consumers of automatic tampers would, therefore, be harmed by the joint venture. Further, post-judgment relief, such as divestiture, would not effectively remedy the injury to competition threatened by this transaction. I find, therefore, that the government has carried its burden to demonstrate irreparable harm.

### Public Interest

■ I further find that a preliminary injunction would be in the public interest.

By enacting Section 7, Congress declared that the preservation of competition is always in the public interest. *Marathon Oil,* 530 F.Supp. at 320; *Ingersoll–Rand,* 218 F.Supp. at 545. An injunction would prevent consummation of the joint venture and preserve the present competition between the defendants. The public has an interest in the preservation of competition in the market, and an injunction is necessary to protect that interest.

### *Harm to Others*

 The preliminary injunction would, of course, impose a risk of harm upon the defendants because it will prevent them from consummating the joint venture. This private, financial harm must, however, yield to the public interest in maintaining effective competition. *FTC v. Food Town Stores,* 539 F.2d 1339, 1346 (4th Cir.1976); *Christian Schmidt Brewing,* 600 F.Supp. at 1332; *United States v. Columbia Pictures Industries, Inc.,* 507 F.Supp. 412, 434 (S.D.N.Y.1980). As the court held in *United States v. Atlantic Richfield Co.,* 297 F.Supp. 1061, 1074 (S.D.N.Y.1969), the private interest in obtaining increased profits from such a transaction, "cannot outweigh the public interest in preventing this merger from taking effect pending trial.... The public interest with which Congress was concerned in enacting Section 7 is paramount." I find, therefore, that the harm to others from preservation of the *status quo* pending trial does not outweigh the potential harm associated with allowing the proposed joint venture to proceed.

### *Conclusion*

The government has established a substantial likelihood of success on the merits of its Section 7 claim. I find that irreparable harm would occur, in the absence of injunctive relief, because the proposed joint venture would have anticompetitive effects and because the other available remedies are insufficient to remedy those effects. Further, I find that the public's interest in preserving competition will be served by a preliminary injunction maintaining the *status quo* pending trial. Finally, although the injunction will harm the defendants, their private financial interests cannot outweigh the public interest in maintaining effective competition. Thus, I conclude that the government is entitled to the injunctive relief sought.

### PRELIMINARY INJUNCTION

In accordance with the opinion dated February 7, 1989;

IT IS HEREBY ORDERED that Plaintiff's Motion for Preliminary Injunction is GRANTED;

IT IS FURTHER ORDERED that Defendants Ivaco, Inc. and Jackson Jordan, Inc. and all persons acting on their behalf, are hereby ENJOINED and RESTRAINED from taking any action, directly or indirectly, in furtherance of a joint venture between Defendants Ivaco, Inc. and Jackson Jordan, Inc. or any other plan or agreement by which the Defendants will combine any of their capital stock, or any of their assets, pending final adjudication of the merits of this case or further order of the Court.